**COHEN TAUBER SPIEVACK & WAGNER P.C.**
Jeffrey M. Lichtstein (NJ Attorney ID No. 011852012)
420 Lexington Avenue, Suite 2400
New York, New York 10170
(212) 586-5800
jlichtstein@ctswlaw.com

*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JNL MANAGEMENT, LLC and JONATHAN LASKO,<br><br>Plaintiffs,<br><br>v.<br><br>HACKENSACK UNIVERSITY MEDICAL CENTER, CARRIER CLINIC, INC., DRINKER BIDDLE & REATH LLP, and ANTONIO M. POZOS,<br><br>Defendants. | Case No.:<br><br>***COMPLAINT AND JURY DEMAND*** |

Plaintiffs JNL Management, LLC ("JNL") and Jonathan Lasko ("Lasko," and together with JNL, "Plaintiffs"), by their attorneys, Cohen Tauber Spievack & Wagner P.C., for their Complaint against defendants Hackensack University Medical Center ("HUMC"), Carrier Clinic, Inc. ("Carrier"), Drinker Biddle & Reath LLP ("DBR"), and Antonio M. Pozos ("Pozos") state as follows:

### Nature of Action

1.  This action arises out of HUMC and Carrier's breach of their duty of good faith and fair dealing in refusing to proceed with a joint venture for a contemplated behavioral health, residential substance abuse, detoxification, and rehabilitation center in Mahwah, New Jersey (the

"Facility"), based on false, inaccurate and/or misleading information supplied by Carrier's counsel, Drinker Biddle & Reath LLP.

After executing a letter of intent for the joint venture in July 2017, JNL, HUMC, and Carrier took numerous steps in furtherance of consummating the transaction for the Facility. After JNL expended significant time and resources, and with the finish line for the transaction rapidly approaching after the parties had already reached agreement on the material business terms, HUMC and Carrier pulled the plug on the joint venture, claiming that they received information from DBR about Mr. Lasko (JNL's principal) based upon which they decided to not proceed with the joint venture. Not only was the information relayed by DBR false, inaccurate, and/or misleading, but in no measure could it constitute a good faith basis to abandon the joint venture. This was expressed to HUMC and Carrier, however, they refused to proceed with the joint venture and improperly terminated the letter of intent.

As a result, JNL was left without the ability to consummate the contemplated transaction for the Facility, which would have resulted in payments of, at a minimum, $29 million to JNL over the next 20 years, with profits of approximately $16.4 million, plus ownership of real property currently valued at $10.5 million.

## The Parties

2.  Plaintiff JNL Management, LLC, is a Florida limited liability company, with a principal place of business in North Miami Beach, Florida.

3.  Jonathan Lasko is an individual that resides in Florida. Mr. Lasko is the manager and a member of JNL.

4.  Upon information and belief, defendant HUMC is a New Jersey not-for-profit corporation, with a principal place of business located in Hackensack, New Jersey.

5. Upon information and belief, defendant Carrier is a New Jersey private, not-for-profit behavioral healthcare system, with a principal place of business located in Belle Mead, New Jersey.

6. Upon information and belief, DBR is a limited liability partnership with its main office in Philadelphia, Pennsylvania.

7. Upon information and belief, Pozos is a partner with DBR in its Philadelphia office, and resides in Pennsylvania.

## Jurisdiction and Venue

8. Jurisdiction is proper pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties and because the amount in controversy, exclusive of interest and costs, exceeds $75,000.

9. Venue is proper pursuant to 28 USC § 1391(b)(2).

## Allegations Relevant to Claims for Relief

10. JNL is the corporate office and back office management company for multiple drug treatment facilities. It provides accounting, billing and collection services, utilization review, marketing, and human resources support.

11. In or around early 2016, JNL began discussions to purchase property located in Mahwah, New Jersey for use as the Facility. This eventually led to JNL entering into a Contract of Sale for the Mahwah property. The initial purchase price for the property was $11.5 million (which was later reduced to $10.5 million).

12. HUMC is a non-profit, research, and teaching hospital that provides tertiary and healthcare needs. Upon information and belief, it is New Jersey's largest provider of inpatient and outpatient services and, based on admissions, is the fourth largest hospital in the nation.

13. Carrier is a not-for-profit behavioral healthcare system that specializes in psychiatric and addiction treatment. Upon information and belief, Carrier's system includes a licensed inpatient psychiatric hospital, a residential detoxification and rehabilitation center, an adolescent residential facility, and a fully accredited middle and high school for students classified as emotionally disturbed.[1]

14. Beginning in or around May 2016, JNL began discussions with HUMC regarding a joint venture for the Facility, as well as for an acute care inpatient detoxification facility at one of HUMC's satellite hospitals.

15. During May and June 2016, there were numerous calls and meetings between Mr. Lasko and, among others, Mark Sparta, Executive Vice President and Chief Operating Officer of HUMC, Dr. Ihor Sawczuk, President of HUMC, and Dr. Diego Coira, Chairman of the Department of Psychiatry and Behavioral Medicine, Medical Director of Integrative Medicine and Director of The Debra Simon Center for Integrated Behavioral Health and Wellness at HUMC.

16. After a June 2016 meeting, HUMC provided a Non-Disclosure Agreement to Mr. Lasko, which he executed on behalf of JNL. Thereafter, there were several months of negotiations between JNL and HUMC, as well as due diligence conducted by HUMC, which included, among other things, HUMC interviewing and interacting with JNL's staff, reviewing financial models, environmental and site reports, site visits and inspections, and exploring variations of a joint venture with JNL.

---

[1] On or about March 15, 2018, HUMC and Carrier announced that they signed a letter of intent "to form a partnership, a play that would bolster the combined entity's behavioral health operations," which seeks to "leverage Carrier's behavioral health expertise and infrastructure to create a streamlined model of 24-hour access to mental health and addiction care ranging from outpatient, urgent and residential to inpatient settings." The announcement notes that: "Prior to the partnership announcement, Hackensack and Carrier were exploring the development of an addiction treatment center."

17. During this time, JNL was seeking approvals from the Zoning Board of Mahwah because the use contemplated by the Facility was not a "permitted use" under Mahwah's zoning ordinances. JNL applied to the Zoning Board to secure certain variances, including a use variance, for operation of the Facility.

18. On or about September 7, 2016, the Board of Adjustment of Mahwah approved the use variance application of JNL and granted the relief sought to permit a full-service detoxification and rehabilitation facility. In the weeks thereafter, there were numerous communications with HUMC in an effort to formalize the arrangement between HUMC and JNL for the Facility, as well as for a detoxification facility within one of HUMC's satellite hospitals.

19. On or about September 28, 2016, Dr. Coira advised that HUMC was "very interested" in partnering with JNL for the Facility. Mr. Sparta confirmed this interest, indicated that he was aware that JNL was in discussions with other potential partners for the Facility, and requested that JNL proceed only with HUMC. Consequently, Mr. Lasko ceased communications with other potential joint venture partners and directed his focus on moving forward with a joint venture with HUMC.

20. In October 2016, there were continued negotiations regarding the structure for a joint venture for the Facility. The initial structure suggested by HUMC included 20-25 detoxification beds and up to 52 residential treatment beds, with HUMC contributing approximately $4.5 million towards the acquisition of the Facility and overseeing the retrofit of the Facility. In exchange, HUMC would own a percentage of the Facility commensurate with their investment and would receive a right of first refusal/purchase option. Based upon this proposed structure, financial models were created by JNL and provided to HUMC.

21. In November 2016, HUMC was advised that the approval for the Mahwah site was finalized and was expected to be approved at the next Zoning Board meeting. Around this time, JNL advised HUMC that the seller of the property for the Facility had agreed to amend the Contract of Sale in order to provide JNL with additional time to enter into a joint venture with HUMC. As part of its continuing due diligence, HUMC made additional requests for information, to which JNL responded.

22. Negotiations stalled after several months of additional discussions, and therefore, JNL began discussions with another major healthcare provider regarding a joint venture for the Facility. These discussions resulted in an NDA with that entity and subsequent meetings, site visits, and substantial due diligence.

23. Upon information and belief, HUMC became aware of the discussions that JNL was having with another potential partner and sought to re-engage JNL in discussions regarding a joint venture for the Facility. HUMC assured Mr. Lasko that it would quickly consummate a transaction for the Facility.

24. As a result of the revitalized discussions with HUMC, JNL decided to forego continuing discussions with any other potential partners related to the Facility.

25. Around this time, HUMC advised JNL that it was exploring a relationship with Carrier and that any joint venture would now include Carrier.

26. The discussions with HUMC and Carrier eventually led to the parties executing a Letter of Intent, effective "as of July 1, 2017" (the "LOI"). (A copy of the LOI is annexed hereto as Exhibit 1 and is incorporated by reference herein.)

27. As expressed in the LOI:

> B. A public health crisis exists in the Township of Mahwah, the County of Bergen and the State of New Jersey as a result of the increase in usage of opioids

and the lack of resources and the need for facilities in the State, the County and the local level.

C.     HUMC is a statewide integrated health care delivery system which has identified providing resources to combat the public health crisis as an objective.

D.     Carrier is a New Jersey private, not-for-profit behavioral healthcare system specializing in psychiatric and addiction treatment.

E.     Treatment Management owns and operates several detoxification and rehabilitation facilities primarily located in Florida and its affiliated entity JPNJ Real Estate LLC has received a Use Variance from the Zoning Board of Adjustment of the Township of Mahwah to permit the operation of a Behavioral Health, Substance Abuse, Detoxification and Residential Rehabilitation Center on property located at Block 23, Lot 45, commonly known as 1071 Ramapo HUMC Road, Mahwah, New Jersey as set forth in the Resolution of approval Docket No. 1405-16 dated December 7, 2016 (the "Mahwah Facility").

F.     The Joint Venture Partners believe that working together they can establish pre-eminent, national class Behavioral Health, Substance Abuse, Detoxification and Residential Rehabilitation Centers operated as a cohesive, integrated, provider of detoxification and rehabilitation services serving the County of Bergen, the State of New Jersey and the surrounding regions.

28.     The LOI contemplated the parties establishing a "Management Entity" to control the management and operation of the Facility. The contemplated joint venture was to be:

> structured as follows: (a) a not for profit entity owned 51% by HUMC and 49% by Carrier (the "Management Entity") and (b) a separate entity owned 100% by a for profit single purpose entity ("SPE") to be created by Treatment Management or its designated affiliate, shall be formed to acquire and purchase the Mahwah Facility (the "Real Estate Entity"). Through the Management Entity, the Joint Venture Partners will implement joint strategies and programs to minimize the outmigration of detoxification and rehabilitation care from the region and the State, to meet the needs and interests of the region and its addicted patients and their families, and to maximize the impact of the resources, programs and services of the Joint Venture Partners.

(LOI, Section 1)

29.     Section 2 of the LOI provided that:

Treatment Management intends to purchase the Mahwah Facility for the acquisition price of $11.5 million (subject to reductions for items contained in inspection reports) as set forth in the proposed Contract of Sale by and between

> the Carmelite Fathers of New Jersey/Society of Mount Carmel and JPNJ Real Estate LLC.  Treatment Management, or its designee shall enter into a Master Lease with the Management Entity for an initial period of 99 years, subject to extension, upon lease payment terms to be determined based upon a fair market appraisal to be prepared by an MAI appraiser to be mutually agreed upon by the parties. The parties will use their best efforts to execute the Master Lease, on mutually agreeable terms, within 45 days of the receipt of the appraisal report . . . Treatment Management will share in the profits of the operation of the Mahwah Facility and the revenues derived therefrom, in accordance with parameters to be set forth in a mutually agreed upon Management Agreement.

The joint venture was structured in this manner at the request of HUMC and Carrier.

30. The LOI further detailed the intended uses of the Facility and provided for JNL to share in the profits from the operation and/or management of the Facility.

31. The LOI also noted that: "The Management Entity agrees that it will use its best efforts to develop, as an additional component of the Behavioral Health, Substance Abuse, Detoxification and Residential Rehabilitation Center, an acute hospital based detox facility at HUMC.  In the event of the implementation of such Acute Hospital Based Facility, it is intended that Treatment Management shall participate and/or provide management services, to the extent permissible and practicable, with HUMC in overseeing the day-to-day operations of such acute hospital based detox facility."

32. Following the execution of the LOI, among other things, JNL entered into a revised contract of sale with the seller of the property (based upon the terms set forth in the LOI), lease payment terms were determined based on an appraisal that was performed, non-refundable deposits were made, a commitment letter for financing was secured, there were numerous meetings with various professionals, including engineers and architects and the Borough of Mahwah, and site plans were developed.  JNL spent hundreds of hours and incurred significant fees in connection with the contemplated joint venture.

33. JNL complied with HUMC and Carrier's requests as part of their due diligence, including, without limitation, repetitive requests for information and numerous site visits (including a visit with potential donors prior to a fundraiser for HUMC).

34. Although the LOI provided that it would "automatically terminate on _____, 2017, unless sooner terminated," the parties continued to act in furtherance of consummating the joint venture well into 2018. There was never any discussion or mention of the fact that the LOI was terminated on or after December 31, 2017. To the contrary, with the knowledge of HUMC and Carrier, JNL continued to take the necessary steps for the consummation of the joint venture for the Facility, the parties continued to negotiate and exchange drafts of the lease for the property, JNL continued to take steps to finalize terms with the bank for financing, and engineers, architects, and lawyers performed various services related to the joint venture. In fact, in December 2017, a Feasibility Study commissioned by HUMC and Carrier was completed, which included plans and sketches for construction and renovation of the Facility.

35. By early February 2018, the material terms of the lease for the property had been negotiated and the only remaining item left to complete for the lease to be executed was the mere formality of a legal name for the entity HUMC and Carrier were going to use on the lease.[2]

36. Also by February 2018, JNL had arranged for the financing to acquire the property. A pre-requisite for the financing was the execution of the lease for the property. Once the lease was executed, the financing for the acquisition of the property would be completed, and JNL would be able to close on the purchase of the property for the Facility. JNL paid the commitment fee for the financing and the bank began its appraisal of the property.

---

[2] At HUMC and Carrier's request, the parties agreed to reduce the contemplated 99-year lease term under the LOI to 20 years with options to extend.

37. The term for the lease was 20 years with an extension option. For the initial six months, payments to JNL under the lease were $70,000 per month, then increasing to $108,333.33 per month for the next 30 months, with 1.5% annual increases after the third year. The monthly debt service under the financing secured by JNL was $52,465.23.

38. On February 16, 2018, counsel for JNL, Holly Schepisi, was advised by Mr. Sparta and Audrey Murphy, Executive Vice President and General Counsel of HUMC, that HUMC and Carrier were not going to proceed with the joint venture because they were informed by DBR that, among other things:

- Mr. Lasko is a "person of interest" in connection with the prosecution of Philip Esformes[3] and the Department of Justice "is not done with" Mr. Lasko;
- Mr. Esformes maintains a financial interest in JNL;
- Mr. Lasko had, or has, a business relationship with a "Mr. Delgado," a person involved in the Esformes matter; and
- Mr. Lasko is being investigated for possibly referring patients to facilities in which Mr. Esformes had or has an interest.

Ms. Schepisi was advised that the information came from DBR through a "recently hired partner who was formerly with the DOJ." According to publicly available information, Pozos joined DBR on or about January 16, 2018, after previously being employed in the Criminal Fraud Divison of the United States Department of Justice.

39. In a conversation later that day, Mr. Sparta and Jim Blazar, Executive Vice President and Chief Strategy Officer of HUMC, repeated to Mr. Lasko what was told to Ms. Schepisi. Mr. Sparta further advised Mr. Lasko that he was "disappointed," as if not for the information provided by DBR, HUMC was ready to execute the lease and proceed to immediately consummate the joint venture contemplated by the LOI. Mr. Sparta told Mr. Lasko

---

[3] Mr. Esformes is the owner of skilled nursing and assisted living facilities who is awaiting trial for alleged Medicare fraud.

that an attorney from DBR who was formerly with the DOJ was on the call where the information regarding Mr. Lasko was revealed.

40. At the time of these February 16 calls, HUMC and Carrier were already aware that Mr. Lasko had unrelated business dealings with Mr. Esformes. Indeed, based on their knowledge of Mr. Lasko's relationship with Mr. Esformes, they requested a provision in the lease that would permit them to acquire ownership of the property in the event Mr. Lasko (or any entity he is affiliated with) were prohibited from participating in federal programs, including Medicare. The provision in the lease, as requested, negotiated, and agreed to by HUMC and Carrier, provided that:

> Tenant is further granted the right to purchase all of Landlord's interest in the Premises for fair market value, in the event that Jon Lasko or any entity with which he is affiliated is precluded or otherwise limited in any way from future participation in any federal program including, but not limited to Medicare, Tenant shall pay Landlord a fair market value for Landlord's interest in the Premises. In the event the parties are unable to agree upon the fair market value, the parties shall agree that the fair market value shall be determined through the binding arbitration process set forth in Section 5(f) hereof; provided, however, that the purchase shall not be less than the cost of acquisition, including acquisition expenses, with a twenty percent (20%) appreciation in value.

41. During a site tour of the property with the architect weeks earlier, Donald Parker, CEO and President of Carrier, made a remark to Ms. Schepisi about Mr. Lasko's relationship with Mr. Esformes. Mr. Parker commented that he did not think Mr. Lasko would be willing to agree with the addition to the lease proposed by HUMC and Carrier. Notwithstanding Mr. Parker's intuition, Mr. Lasko agreed to the clause (noted above) in the lease.

42. Putting aside the fact that the statements made by DBR and/or Pozos were false and/or misleading, the purported reason stated by HUMC and Carrier for not proceeding with the joint venture related to a relationship that they were aware of and negotiated specific provisions

to deal with. There was no information requested or sought by HUMC and Carrier related to Mr. Esformes that JNL did not provide.

43. In addition, the statements made by DBR and/or Pozos to HUMC and Carrier about Mr. Lasko referenced above are false, inaccurate, and/or misleading.[4]

44. By letter dated February 20, JNL advised HUMC and Carrier that:

> the statements made by DBR, aside from shocking and wholly inappropriate, are, at a minimum, erroneous and inaccurate . . .
>
> HUMC and Carrier have been aware for quite some time that Mr. Lasko had prior, wholly unrelated business dealings with Mr. Esformes. Indeed, there were specific clauses inserted into the Lease as a result of such prior dealings . . . DBR's improper and inaccurate statements cannot serve as a good faith basis for HUMC and Carrier to refuse to proceed with the Transaction . . .
>
> There are urgent, time sensitive matters that must be dealt with to consummate the Transaction. HUMC and Carrier each have an obligation to proceed with consummating the Transaction. Lasko is ready, willing, and able consummate the Transaction and to enter into all the necessary agreements to effectuate the closing of the Transaction.

JNL requested that Defendants "confirm, ***by no later than 12:00 p.m. Wednesday, February 20, 2018***, that HUMC and Carrier are prepared to proceed with the Transaction. The next step will be to execute the Lease (a final version of which was provided by my office to Mr. Rosenberg last week)."

45. On February 26, HUMC and Carrier responded that they were not intending on proceeding with consummating the joint venture.[5]

---

[4] Even, assuming *arguendo*, that the statements were true, they should not have been disclosed by Pozos as, at a minimum, Pozos committed a violation of his duty of confidentiality. (Upon information and belief, there is no publicly available information regarding such allegations.) There may be additional improperities committed by Pozos, including, without limitation, violations of the Federal Rules of Criminal Procedure, as well as state bar rules and federal regulations, but that is not for this matter.

[5] Surprisingly, DBR represented Carrier in communications regarding this matter.

46. By letter dated February 27, 2018, JNL reiterated that:

> following the execution of the LOI, HUMC, Carrier, and Lasko (as those entities are defined in my February 20 letter), were under an obligation to negotiate *in good faith* towards the consummation of the Transaction. As noted in my prior letter, the reasons provided by HUMC and Carrier on February 16 for not proceeding with the Transaction -- when it was rapidly approaching the finish line after Lasko had expended significant time and resources -- violated their respective duties to negotiate in good faith. (I note that neither HUMC nor Carrier has disputed, in any respect, that the statements made by DBR led to HUMC and Carrier deciding not to proceed with the Transaction, and no one has disputed that DBR made, in sum or substance, the statements that were noted.) Separately, HUMC and Carrier's actions violate the implied duty of good faith and fair dealing under New Jersey law.

47. Based on the lack of response to the February 27, 2018 letter, on March 5, 2018, JNL advised HUMC and Carrier: "This serves as notice that Lasko is now considering the LOI as having been improperly terminated by HUMC and Carrier and will proceed accordingly."[6]

48. Based on HUMC and Carrier's refusal to proceed with the joint venture, JNL has been unable to consummate the acquisition of the property for use as the Facility.

49. Based on the foregoing, HUMC and Carrier breached their duty of good faith and fair dealing owed to JNL, and JNL is entitled to damages, including, without limitation: (i) what it expended in connection with the contemplated joint venture (approximately $400,000.00); (ii) the profits it would have derived from the consummation of the joint venture, including without limitation, profits derived from the contemplated lease and management of the Facility, which total in excess of $16.4 million; and (iii) damages resulting from the failure to close on the acquisition of the Mahwah property.

---

[6] In the post-February 16 communications with HUMC, Carrier, and DBR, there was no denial that Pozos was indeed the source of the statements made about Mr. Lasko or that the statements noted were, in fact, made.

50. In addition, DBR and Pozos have defamed Mr. Lasko, portrayed him in a false light, and have tortiously interfered with JNL's prospective business relationship, which has caused substantial financial and reputational harm to JNL and Mr. Lasko.

### First Claim for Relief: Breach of the Implied Covenant of Good Faith and Fair Dealing (Against HUMC and Carrier)

51. Plaintiffs repeats the allegations contained in paragraphs 1 through 50 above as if fully set forth herein.

52. The LOI is a valid and enforceable agreement.

53. Following the execution of the LOI, HUMC and Carrier were under an obligation to negotiate and act with JNL in good faith and to deal fairly with JNL.

54. Based on the acts and events described above, HUMC and Carrier breached the duty owed to JNL.

55. JNL fully complied with its obligations under the LOI and, at all times, negotiated in good faith and dealt fairly with HUMC and Carrier.

56. As a direct and proximate result of HUMC and Carrier's breach of the implied covenant of good faith and fair dealing owed to JNL, JNL has been damaged, in an amount to be determined at trial, but in no event less than $17,000,000, plus costs and interest.

### Second Claim for Relief: Defamation (Against DBR and Pozos)

57. Plaintiffs repeat the allegations contained in paragraphs 1 through 56 above as if fully set forth herein.

58. The statements made by DBR and/or Pozos to HUMC and Carrier referenced above were false, inaccurate, and/or misleading, and were made in a reckless fashion.

59. As a direct and proximate result of the statements made by DBR and/or Pozos, HUMC and Carrier decided not to proceed with the joint venture and terminated the LOI.

60. As a result, JNL and Lasko were damaged, in an amount to be determined at trial, but in no event less than $17,000,000, plus attorneys' fees and costs.

61. The statements made by DBR and/or Pozos were also made with a wrongful intent to injure JNL and Lasko's personal and professional reputation, entitling JNL and Lasko to an award of punitive damages, in an amount to be determined at trial.

### Third Claim for Relief: False Light (Against DBR and Pozos)

62. Plaintiffs repeat the allegations contained in paragraphs 1 through 61 above as if fully set forth herein.

63. As described above, the statements made by DBR and/or Pozos to HUMC and Carrier referenced above were false, inaccurate, and/or misleading, were made in a reckless fashion, and were highly offensive to a reasonable person.

64. DBR and Pozos had knowledge of or acted in reckless disregard as to the falsity of the statements made.

65. As a direct and proximate result of the statements made by DBR and/or Pozos, HUMC and Carrier decided not to proceed with the joint venture and terminated the LOI.

66. As a result, JNL and Lasko were damaged, in an amount to be determined at trial, but in no event less than $17,000,000, plus attorneys' fees and costs.

67. The statements made by DBR and/or Pozos were also made with a wrongful intent to injure JNL and Lasko's personal and professional reputation, entitling JNL and Lasko to an award of punitive damages, in an amount to be determined at trial.

### Fourth Claim for Relief: Tortious Interference with Prospective Business Relations (Against DBR and Pozos)

68. Plaintiffs repeat the allegations contained in paragraphs 1 through 67 above as if fully set forth herein.

69.     As described above, until DBR and/or Pozos made the statements referenced above to HUMC and Carrier, JNL had a reasonable expectation that the joint venture would be consummated.

70.     As described above, DBR and Pozos intentionally and maliciously interfered with the prospective joint venture by conveying false, inaccurate, and/or misleading information to HUMC and Carrier.

71.     As a direct and proximate result of DBR and Pozos' interference, HUMC and Carrier decided not to proceed with the joint venture and terminated the LOI.

72.     But for DBR and Pozos' interference, there is a reasonable probability that JNL would have received the economic benefits of the joint venture.  As a result of DBR and Pozos' interference, JNL lost a prospective economic gain it otherwise would have received

73.     As a result, JNL has been damaged, in an amount to be determined at trial, but in no event less than $17,000,000.

74.     The actions of DBR and Pozos, as described above, were so egregious as to warrant an award of punitive damages to JNL and Lasko, in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor, as follows:

(A)     On the First Claim for Relief, for Breach of the Implied Covenant of Good Faith and Fair Dealing against defendants HUMC and Carrier, in an amount to be determined at trial, but in no event less than $17,000,000, plus interest and costs;

(B)     On the Second Claim for Relief, for Defamation against defendants DBR and Pozos, in an amount to be determined at trial, but in no event less than $17,000,000,

plus attorneys' fees and costs, and an award of punitive damages, in an amount to be determined at trial;

(C)   On the Third Claim for Relief, for False Light against defendants DBR and Pozos, in an amount to be determined at trial, but in no event less than $17,000,000, plus attorneys' fees and costs, and an award of punitive damages, in an amount to be determined at trial;

(D)   On the Fourth Claim for Relief, for Tortious Interference with Prospective Business Relations against defendants DBR and Pozos, in an amount to be determined at trial, but in no event less than $17,000,000, and an award of punitive damages, in an amount to be determined at trial; and

(E)   For such other and further relief as the Court may deem just and proper.

Dated:  April 3, 2018

                                   COHEN TAUBER SPIEVACK & WAGNER P.C.
                                   *Counsel for Plaintiffs*

By:  _____
       Jeffrey M. Lichtstein
       NJ Attorney ID No. 011852012
       420 Lexington Avenue
       Suite 2400
       New York, New York 10170
       (212) 586-5800
       jlichtstein@ctswlaw.com

## **DEMAND FOR JURY**

Plaintiffs hereby demand a trial by jury on all matters to be tried.

Dated: April 3, 2018

                COHEN TAUBER SPIEVACK & WAGNER P.C.
                *Counsel for Plaintiffs*

By: _/s/ Jeffrey M. Lichtstein_
       Jeffrey M. Lichtstein
       NJ Attorney ID No. 011852012
       420 Lexington Avenue
       Suite 2400
       New York, New York 10170
       (212) 586-5800
       jlichtstein@ctswlaw.com